Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Kimberly Macey (SBN 342019)
Jessica R. Cook (SBN 339009)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
kmacey@girardsharp.com
jcook@girardsharp.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAN MARKELS and ALLEN ZIMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>AARP,<br><br>Defendant. | Case No.<br><br>**JURY DEMAND**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**<br><br>1. Video Privacy Protection Act, 18 U.S.C. § 2710;<br>2. Unfair Competition Law, Cal. Bus. and Prof. Code § 17200, *et seq.*;<br>3. Deceptive Trade Practices Act, R.I Gen. Laws § 6-13.1-1, *et seq*.<br>4. Unjust Enrichment. |

Plaintiffs Jan Markels and Allen Ziman, on behalf of themselves and all others similarly situated, allege as follows based on personal knowledge and on information and belief based on investigations of counsel.

**INTRODUCTION**

1. This is a consumer privacy class action against AARP for violating the Video Privacy Protection Act ("VPPA" or "the Act") and state law by disclosing its digital users' identities and video-viewing preferences to Meta Platforms, Inc. ("Meta") without proper consent. Meta owns the popular social media platforms Facebook and Instagram.

2. The VPPA prohibits "video tape service providers," such as AARP, from knowingly disclosing consumers' personally identifiable information ("PII"), including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without the person having expressly given consent in a standalone consent form.

3. AARP collects and shares users' personal information with Meta using a "Meta Pixel" or "Pixel." A Meta Pixel is a snippet of programming code that tracks users as they navigate through a website, including what searches they performed and which items they have clicked on or viewed.

4. The Meta Pixel sends information to Meta in a data packet containing PII, such as the users' IP address, name, email, or phone number. Meta then stores this data on its own servers.

5. In this case, by its incorporation of Meta Pixel, AARP shared PII with Meta including at least the user's Facebook Profile ID and the title of the video that the user watched. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details.

6. AARP discloses the user's Facebook Profile ID and viewing content to Meta together in a single, unencrypted transmission in violation of the VPPA. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any other

person—can use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile. In other words, the Pixel allows Meta to know what video content one of its users viewed on AARP's website.

7.  AARP users do not consent to AARP's disseminations of users' viewing content along with Facebook Profile IDs to a third party through a standalone consent form, as required by the VPPA. As a result, AARP violates the VPPA by disclosing this information to Meta.

8.  On behalf of a Class of similarly situated AARP users, Plaintiffs seek relief through this action. Based on the facts set forth in this Complaint, AARP violated the Video Privacy Protection Act ("VPPA"), the Unfair Competition Law ("UCL"), the Consumer Legal Remedies Act ("CLRA"), the Rhode Island Deceptive Trade Practices Act ("DTPA"), and is liable for unjust enrichment.

## **PARTIES**

9.  Plaintiff Jan Markels is a citizen and resident of San Francisco, California.

10. Plaintiff Allen Ziman is a citizen and resident of Warwick, Rhode Island.

11. Defendant AARP is a Washington, D.C. corporation headquartered at 601 E. Street, NW Washington, D.C. 20049.

## **DIVISIONAL ASSIGNMENT**

12. Pursuant to Civil L.R. 3-5(b), assignment to the San Francisco Division is appropriate under Civil L.R. 3-2(c) because at least one plaintiff is domiciled in San Francisco and a substantial part of the conduct at issue in this case occurred in San Francisco County.

## **JURISDICTION AND VENUE**

13. This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710.

14. This Court also has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of

interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

15. This Court has personal jurisdiction over AARP because it has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary. AARP continuously and systematically conducts business in California. Additionally, AARP's violations occurred, at least in part, in California, because AARP collected and shared information that is the subject of this action from a California Plaintiff's device, which was at all relevant times located in the state of California.

16. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Jan Markels

17. Plaintiff used his internet-connected devices and the browser installed on those devices to visit and watch video content on AARP's website, https://www.aarp.org, during the Class Period as defined herein.

18. Plaintiff Markels is an AARP member and subscriber.

19. Plaintiff Markels pays approximately $16 per year in AARP subscription fees.

20. Plaintiff Markels provided AARP with his PII, including at least his name and address, when subscribing to its services.

21. Plaintiff Markels has maintained a Facebook account for approximately 14 years and spends approximately thirty minutes per day on Facebook. Plaintiff Markels's Facebook profile includes personal information about him including his name and other personal details.

22. Plaintiff Markels has maintained an Instagram account for approximately 2 years and spends about 30 minutes per day on Instagram.

23. Plaintiff Markels visited the AARP website using his web browser to view video content.

24. Plaintiff Markels requests and watches videos on AARP using the same browser that he uses to login to Facebook, including while he is logged in to Facebook. Plaintiff Markels uses the same device to request and watch videos on AARP that he uses for Facebook.

25. AARP sent to Meta Plaintiff Markels's PII, including his Facebook Profile ID, as well as the title of each video he viewed, without obtaining consent through a standalone consent form.

26. Plaintiff Markels's PII and viewing history are private and confidential in nature and assets to which no third party has a presumptive right to access without a standalone consent form.

**Allen Ziman**

1. Plaintiff used his internet-connected devices and the browser installed on those devices to visit and watch video content on AARP's website, https://www.aarp.org, during the Class Period as defined herein.

2. Plaintiff Ziman is an AARP member and subscriber.

3. Plaintiff Ziman pays approximately $16 per year in AARP subscription fees.

4. Plaintiff Ziman provided AARP with his PII, including his name, email address, and date of birth, when subscribing to its services.

5. Plaintiff Ziman has maintained a Facebook account for approximately seven years and spends approximately two hours per day on Facebook. Plaintiff Ziman's Facebook profile includes personal information about him including his name and other personal details.

6. Plaintiff Ziman visited the AARP website using his web browser to view video content.

7. Plaintiff Ziman requests and watches videos on AARP using the same browser that he uses to login to Facebook, including while he is logged in to Facebook. Plaintiff Ziman uses the same device to request and watch videos on AARP that he uses for Facebook.

8. AARP sent to Meta Plaintiff Ziman's PII, including his Facebook Profile ID, as well as the title of each video he viewed, without obtaining consent through a standalone consent form.

9. Plaintiff Ziman's PII and viewing history are private and confidential in nature and assets to which no third party has a presumptive right to access without a standalone consent form.

## COMMON ALLEGATIONS

**A.  AARP Disclosed Plaintiffs' and Class Members' Private Viewing Information to Meta.**

10. AARP is a nonprofit organization that "help[s] people navigate ageless realities — financial well-being, health, how to contribute to society and local communities, and how to fully enjoy life."[1] AARP's website includes information on various topics such as health, money, entertainment. AARP's website also offers content such as videos, podcasts, and games.

11. AARP provides prerecorded audiovisual content on its website, which Plaintiffs requested and viewed.

12. While Plaintiffs and Class members were viewing video content on AARP's website, AARP transmitted this information to Meta, the multinational technology conglomerate that owns social media networks www.Facebook.com ("Facebook") and www.Instagram.com ("Instagram").

13. AARP's transmission of viewing information to Meta included the specific names of video content viewed by users, as well as the user's Facebook Profile ID, a string of numbers unique to each Facebook profile that personally identified the user.

14. Anyone who possesses a Facebook Profile ID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile, which may contain a vast amount of personal information.

15. While Meta can easily identify any individual on its Facebook platform with only their unique Facebook Profile ID, so too can any ordinary person who comes into possession of a

---

[1] https://www.aarp.org/about-aarp/ (last visited September 18, 2022).

5
CLASS ACTION COMPLAINT
CASE NO.

Facebook Profile ID. Facebook admits as much on its website. Simply put, with only a Facebook Profile ID and the video content name and URL—all of which AARP knowingly provides to Meta without appropriate consent from its subscribers—any ordinary person could learn the identity of the AARP subscriber and the specific video or media content they requested on AARP's website.

16. Facebook profiles may contain a Facebook user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

17. AARP transmitted the video title and Facebook Profile ID information in a single, unencrypted transmission, through a non-customer facing tracking tool called a "Meta Pixel."

18. Meta Pixel is a snippet of programming code that, once installed on a webpage, sends to Meta data relating to the interactions a user takes on a particular website. Meta Pixel tracks users as they navigate through the website and logs which pages are visited, buttons are clicked, and, in this case, which videos a user requested and viewed on AARP.

19. Meta Pixel is an advertising and analytics tool that allows website owners to track visitor actions on their websites and send the corresponding information to Meta; websites use the Pixel to collect analytical data about how users use its website and in turn, are able to target more specific ads to their users. Thus, the Pixel is installed within the code of a website, such as AARP, to increase the business's profits.

20. Further demonstrating that AARP knowingly placed the Pixel in its website code, Meta's own website states that "[t]he Meta Pixel and Facebook SDK are tools that businesses can *choose* to add to their website or app."[2] (Emphasis added).

21. Meta offers its Pixel tool to websites across the internet. As of January 2022, more than 30 percent of popular websites have an embedded Meta Pixel.

---

[2] https://www.facebook.com/help/331509497253087/ (last visited September 15, 2022).

6
CLASS ACTION COMPLAINT
CASE NO.

22. AARP voluntarily chose to install the Meta Pixel within the code of its website.

23. Meta benefits from websites like AARP installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta-owned platforms, like Instagram. In addition, even if the business does not advertise with Meta, the Pixel assists Meta in building more fulsome profiles of its own users, which in turn allows Meta to profit from providing more targeted ads. The Pixel is installed on websites all over the internet and, accordingly, provides Meta with information about its users' preferences, other distinguishing traits, and web-browsing activities outside of Meta-owned platforms.

24. Using the Meta Pixel likewise benefits AARP by providing it with analytical data about its website and improving its ability to promote its content and services to its users. For instance, the data collected through the Meta Pixel is provided to AARP in Meta's "Events Manager," which works with the Meta Pixel to provide website operators with a summary of user activity captured by the Meta Pixel. Meta also offers tools and analytics to reach certain individuals through Facebook ads. AARP can use this information to create "custom audiences" through Meta to target the specific Facebook user, as well as other Facebook users who match members' of the audience's criteria. AARP can also sort through the data collected by Meta Pixel to find specific types of users including, for instance, women over a certain age. AARP also profits from selling parts of their website to display advertisers.

25. Through use of the Meta Pixel, AARP —in the same transmission—discloses to Meta the full name of each video a user watched, together with the user's Facebook Profile ID, thus linking users' browsing activities and preferences to their Facebook profiles. In other words, this single transmission connects a user's video viewing choices with their Facebook Profile ID.

26. AARP violates and invades the privacy rights of users with its practice of sending their Facebook Profile IDs to Meta. Plaintiffs and Class members did not consent to AARP's disclosure of their viewing content and their identities to Meta.

27. The VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710. AARP's website includes its Terms of Service and a Privacy Policy, neither of which operate as a standalone consent form disclosing the information shared through the Meta Pixel and requesting user consent. Accordingly, no user provided AARP with the level of consent required by the VPPA for disclosure of their viewing content and identities to Meta.

**B.    Plaintiffs and Class Members Suffered Harm as a Result of AARP's Privacy Violations.**

28. AARP shared Plaintiffs' personal information (including their video viewing histories and associated Facebook Profile IDs, which they reasonably expected would be kept private) with Meta.

29. The personal information AARP obtained from Plaintiffs and Class members constitutes valuable data in the digital advertising-related market for consumer information. AARP's wrongful acquisition and use of their personal, private information deprived Plaintiffs and Class members of control over that information and prevented them from realizing its full value for themselves.

30. AARP's conduct has resulted in economic harm to Plaintiffs and Class members whose PII diminished in value when AARP made this information available to Meta.

31. AARP's conduct has also resulted in economic harm to Plaintiffs and Class members who were AARP subscribers during the Class Period in that they have paid subscription fees to AARP for services that they did not expect would subject them to the practices described herein, thereby diminishing the value of services for which they paid AARP, and constituting loss.

32. Plaintiffs and Class members paid for access to AARP's website, in part, because they trusted that AARP's privacy practices comported with their privacy preferences.

33. The harms described above are aggravated by AARP's continued retention and commercial use of Plaintiffs' and Class members' personal information, including their private video viewing histories.

## CLASS ALLEGATIONS

34. Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following Class and Subclass:

**Nationwide Class**: All persons residing in the United States who viewed video content on AARP, were Facebook or Instagram users during the time Meta's Pixel was active on AARP, and were logged into Facebook or Instagram during the time Meta's Pixel was active on AARP.

**California Subclass:** All persons residing in California who viewed video content on AARP, were Facebook or Instagram users during the time Meta's Pixel was active on AARP, and were logged into Facebook or Instagram during the time Meta's Pixel was active on AARP.

**Rhode Island Subclass**: All persons residing in Rhode Island who viewed video content on AARP, were Facebook or Instagram users during the time Meta's Pixel was active on AARP, and were logged into Facebook or Instagram during the time Meta's Pixel was active on AARP.

35. The "Class Period" is from January 1, 2013 to the present.

36. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

37. Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

38. **Numerosity**: The Class consists of at least hundreds of thousands of individuals, making joinder impractical.

39. **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include:

   a. Whether AARP's use of the Meta Pixel was without user consent or authorization;

b. Whether AARP obtained and shared or caused to be obtained and shared Plaintiffs' and Class members' personal information through tracking using Meta Pixel, which AARP installed on its webpages;

c. Whether other third parties obtained Plaintiffs' and Class members' personal information as a result of AARP's conduct described herein;

d. Whether AARP's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

e. Whether AARP's conduct violates the Unfair Competition Law, Cal. Bus. and Prof. Code § 17200, *et seq.*;

f. Whether AARP's conduct violates the Deceptive Trade Practices Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

g. Whether AARP was unjustly enriched as a result of sharing users' information with Meta;

h. Whether AARP's acquisition and transmission of Plaintiffs' and Class members' personal information resulted in harm; and

i. Whether AARP should be enjoined from engaging in such conduct in the future.

40. **Typicality**: Plaintiffs' claims are typical of the claims of the Class members in that Plaintiffs, like all Class members, have been injured by AARP's misconduct—disclosing users' PII and viewing content to Meta without consent.

41. **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiffs do not have any interests antagonistic to those of the Class.

42. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce AARP to comply with federal law. Moreover, because the amount of each individual Class member's claim

is small relative to the complexity of the litigation, and because of AARP's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

43. **Injunctive relief**: AARP has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## TOLLING OF THE STATUTES OF LIMITATIONS

44. All applicable statute(s) of limitations have been tolled by AARP's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could not have reasonably discovered AARP's practices of sharing their personal viewing content and PII with Meta until shortly before this class action litigation commenced.

45. AARP was and remains under a continuing duty to disclose to Plaintiffs and Class members its practice of sharing personal viewing content and PII to Meta. As a result of the active concealment by AARP, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FIRST CAUSE OF ACTION
### Violation of the Electronic Communications Privacy Act (the "VPPA")
### 18 U.S.C. § 2710, *et seq.*
### (On Behalf of the Nationwide Class)

46. Plaintiffs incorporate and reallege the above factual allegations by reference.

47. The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

48. As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of

prerecorded video cassette tapes or similar audiovisual materials." AARP is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

49. As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

50. AARP knowingly caused personal viewing information, including Facebook Profile IDs, concerning Plaintiffs and Class members to be disclosed to Meta. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Meta as an individual who viewed AARP's content, including the specific video materials requested and watched on AARP.

51. As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged above, Plaintiffs are subscribers to AARP's services which provide video content to users on its website. Thus, Plaintiffs are "consumers" under this definition.

52. As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. AARP failed to obtain informed, written consent under this definition.

53. Additionally, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(b)(2)(B)(iii). The Act requires video tape service providers to "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." AARP failed to provide an opportunity to opt out as required by the Act.

54. AARP was aware that the disclosures to Meta that were shared through the Pixel identified Plaintiffs and Class members. AARP also knew that Plaintiffs' and Class members' personal viewing content was disclosed to Meta because AARP programmed the Meta Pixel into its website code, knowing that Meta would receive video titles and the subscriber's Facebook Profile ID when a user watched a video.

55. By disclosing Plaintiffs' and Class members' personal viewing content, AARP violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

56. As a result of the above violations, AARP is liable to Plaintiffs and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "actual damages but not less than liquidated damages in an amount of $2,500" per plaintiff. 18 U.S.C. § 2710(c)(2)(A). Under the Act, AARP is also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by AARP in the future.

## SECOND CAUSE OF ACTION
**Violation of California's Unfair Competition Law (the "UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On Behalf of the California Subclass)**

57. California Plaintiff incorporates and realleges the above factual allegations by reference.

58. The UCL proscribes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

### Unlawful

59. A business practice is "unlawful" under the UCL if it violates any other law or regulation.

60. AARP's business acts and practices are unlawful because they violate the VPPA, as set forth above. They also violate California's Consumers Legal Remedies Act, for the reasons stated below. AARP is therefore in violation of the "unlawful" prong of the UCL.

**Unfair**

61. AARP's conduct is unfair in violation of the UCL because it violates California's and the nation's legislatively declared public policy in favor of protection of consumer privacy. *See* S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."); California Bill Analysis, A.B. 375 Assem. (June 27, 2017) (noting that "[t]he unregulated and unauthorized disclosure of personal information and the resulting loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to the destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.").

62. Further, AARP's conduct is unfair because it is unethical, unscrupulous, offensive, and substantially injurious. The gravity of harm resulting from AARP's unfair conduct outweighs any potential utility therefrom. The disclosure of California Plaintiff's and Subclass members' personal information without their express consent raises significant privacy concerns, and any potential utility from these disclosures (such as increased AARP revenue due to more targeted advertising) is outweighed by their considerable harm to California Plaintiff and the Subclass.

63. AARP's unfair business practices include disclosing California Plaintiff's and Subclass members' Facebook Profile ID and viewing content to Meta without authorization or consent, causing harm to California Plaintiff and Subclass members.

64. AARP actually and proximately caused harm to California Plaintiff and Subclass members in that, among other things, they suffered economic injury by overpaying for their subscriptions.

65. For these reasons, AARP is in violation of the "unfair" prong of the UCL.

**THIRD CAUSE OF ACTION**
**Violation of Rhode Island's Deceptive Trade Practices Act (the "DTPA")**
**R.I GEN. LAWS § 6-13.1-1, *et seq*.**
**(On Behalf of the Rhode Island Subclass)**

66. Rhode Island Plaintiff incorporates and realleges the above factual allegations by reference.

67. The DTPA prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 6 R.I. Gen. Laws Ann. § 6-13.1-2.

68. The DTPA allows "[a]ny person who purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice declared unlawful by [the act]" to bring an action. 6 R.I. Gen. Laws Ann. § 6-13.1-5.2.

69. Rhode Island Plaintiff and Subclass members are paid subscribers to AARP's services which provide video content to users on its website. Rhode Island Plaintiff and Subclass members purchased services, namely AARP subscriptions, primarily for personal purposes.

70. The DTPA defines unfair methods of competition and unfair or deceptive acts or practices to mean, among other things: (v) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; (vii) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (xii) engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding; (xiii) engaging in any act or practice that is unfair or deceptive to the consumer; and (xiv) using any other methods, acts, or practices that mislead or deceive members of the public in a material respect. 6 R.I. Gen. Laws Ann. § 6-13.1-1.

71. AARP's acts and practices, as alleged in this complaint, violate the above sections of the DTPA because its practice of sharing users' Facebook Profile IDs and viewing content with

Meta without their consent materially misled Rhode Island consumers. In describing its services and privacy policies, AARP misrepresented and/or omitted the true nature of its information-sharing practices.

72. Additionally, AARP's conduct is unfair in violation of the DTPA because it violates the nation's legislatively declared public policy in favor of protection of consumer privacy. See S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard.").

73. Further, AARP's conduct is unfair because it is unethical, immoral, unscrupulous, offensive, and substantially injurious. The gravity of harm resulting from AARP's unfair conduct outweighs any potential utility therefrom. The disclosure of Plaintiff's and Subclass members' personal information without their express consent raises significant privacy concerns, and any potential utility from these disclosures (such as increased AARP revenue due to more targeted advertising) is outweighed by the considerable harm to Rhode Island Plaintiffs and the Subclass.

74. AARP's unfair business practices include disclosing Rhode Island Plaintiffs' and Subclass members' Facebook Profile ID and viewing content to Meta without authorization or consent, causing harm to Rhode Island Plaintiffs and Subclass members.

75. AARP actually and proximately caused harm to Rhode Island Plaintiff and Subclass members in that, among other things, they suffered economic injury by overpaying for their memberships.

76. By reason of the foregoing, Rhode Island Plaintiff and Subclass members seek all forms of relief, including actual damages or five hundred dollars ($500), whichever is greater. 6 R.I. Gen. Laws Ann. § 6-13.1-5.2.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of the Nationwide Class)**

77. Plaintiffs incorporate and reallege the above factual allegations by reference.

78. AARP acted wrongfully by sharing users' Facebook Profile ID and viewing content to Meta without users' consent.

79. AARP's practice of sharing users' personal information and viewing content with Meta without their consent through a standalone consent form, caused AARP to profit from advertisement revenue it would otherwise not have received.

80. AARP's retention of these ill-gotten gains is unjust and inequitable.

81. Plaintiffs, on behalf of themselves and the Class, accordingly seek restitution, restitutionary disgorgement, and all other appropriate relief permitted by the law of unjust enrichment. There is no adequate remedy at law that would provide redress to Plaintiff and the Class or ensure that AARP will not deploy the same data practices in the future.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A. Certify this case as a class action, and appoint Plaintiffs as Class Representative and the undersigned attorneys as Class Counsel;

B. Enter judgment in favor of Plaintiffs and the Class;

C. Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

D. Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiffs and Class members are entitled;

E. Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F. Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

G. Enter such other orders as may be necessary to restore to Plaintiffs and Class members any money and property acquired by Defendant through its wrongful conduct;

H. Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

I. Award such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: September 27, 2022

Respectfully submitted,

By: */s/ Simon S. Grille*
Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Kimberly Macey (SBN 342019)
Jessica R. Cook (SBN 339009)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
kmacey@girardsharp.com
jcook@girardsharp.com

*Attorneys for Plaintiffs*