COOLEY LLP
TRAVIS LEBLANC (251097) (tleblanc@cooley.com)
MATTHEW D. BROWN (196972) (brownmd@cooley.com)
3 Embarcadero Center
20th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

TIANA DEMAS (*pro hac vice*) (tdemas@cooley.com)
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606
Telephone: (312) 881-6500
Facsimile: (312) 881-6598

BARRETT J. ANDERSON (318539) (banderson@cooley.com)
10265 Science Center Drive
San Diego, CA 92121
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

*Attorneys for Defendant AARP*

UNITED STATES DISTRICT COURT NORTHERN

DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JAN MARKELS and ALLEN ZIMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AARP,<br><br>Defendant. | Case No. 4:22-cv-05499-YGR<br><br>**DEFENDANT AARP'S STATEMENT OF RECENT DECISION**<br><br>Courtroom: 1– 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Action Filed: September 27, 2022<br>Trial Date: Not Assigned |

AARP respectfully submits this Statement of Recent Decision pursuant to Civil Local Rule 7-3(d)(2) in connection with its Motion to Dismiss the Complaint (Dkt. 22). The Statement is to inform the Court of the recent order issued by Judge P. Kevin Castel of the U.S. District Court for the Southern District of New York in *Carter v. Scripps Networks LLC*, Case No. 22CV2031 (PKC) (S.D.N.Y. Apr. 24, 2023). The order is attached as Exhibit A.

The court granted the defendant's motion to dismiss a claim asserting violation of the Video Privacy Protection Act ("VPPA"), holding that the plaintiffs were not "subscribers" under VPPA because "the Complaint does not include facts that plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience." (Ex. A at 12.)

Dated: April 25, 2023                                            COOLEY LLP

                                                                 By: */s/ Travis LeBlanc*
                                                                    Travis LeBlanc

                                                                 *Attorneys for Defendant AARP*

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CRYSTAL CARTER, SUSAN CIFELLI and
LETITIA TAYLOR, individually and on behalf
of all others similarly situated,

                 Plaintiffs,

                                                                                   22-cv-2031 (PKC)

         -against-                                            OPINION AND ORDER

SCRIPPS NETWORKS, LLC,

                 Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

         Plaintiffs in this putative class action assert that defendant Scripps Networks, LLC ("HGTV") collects and discloses to Facebook their identities and video-streaming activities on hgtv.com. The Complaint asserts that HGTV unlawfully disclosed plaintiffs' personally identifiable information in violation of the Video Privacy Protection Act of 1988, 18 U.S.C. § 2710(b)(1) (the "VPPA"). HGTV moves to dismiss the Complaint pursuant to Rules 12(b)(1) and Rules 12(b)(6), Fed. R. Civ. P.

         For the reasons that will be explained, the Court concludes that the Complaint alleges a concrete harm, and that plaintiffs have Article III standing. HGTV's Rule 12(b)(1) motion will be denied. However, the Complaint does not plausibly allege that plaintiffs' newsletter subscriptions made them "subscribers" under the VPPA, and therefore fails to allege that plaintiffs are in a category of persons eligible to bring a claim under the VPPA. The motion to dismiss will therefore be granted.

BACKGROUND.

In reviewing this Rule 12(b)(6) motion, the Court assumes all factual allegations in the Complaint to be true and draws all reasonable inferences in favor of plaintiffs as non-movants.  See, e.g., Peretti v. Authentic Brands Grp. LLC, 33 F.4th 131, 137 (2d Cir. 2022).

HGTV owns and operates hgtv.com, a website that hosts hundreds of videos featuring home and lifestyle content.  (Compl't ¶¶ 2, 15.)  The website is popular, and averages approximately 9.9 million visitors each month.  (Id. ¶ 2.)

In addition to viewing the site's videos, visitors to hgtv.com have an option to subscribe to newsletters tailored to their interests.  (Id. ¶ 42.)  To receive an hgtv.com newsletter, the subscriber enters an email address and chooses from themes like "HGTV Weekend Projects" and "HGTV Inspiration."  (Id. ¶¶ 38, 42.)  Plaintiffs Crystal Carter, Susan Cifelli and Letitia Taylor each subscribed to at least one hgtv.com newsletter.  (Id. ¶¶ 52, 57, 62.)  As alleged in the Complaint:  "The principal purpose of the newsletter is to drive traffic to HGTV's website.  The overwhelming amount of content featured in the newsletter links back to articles and videos on hgtv.com."  (Id. ¶ 43; see also id. ¶ 82 (defendant's newsletter "advertises and promotes videos and articles on its website, hgtv.com.").)  The Complaint does not assert that a newsletter subscription was required to view videos on hgtv.com, nor does it assert that a newsletter subscription gave access to enhanced audio visual content.

In addition to subscribing to an hgtv.com newsletter, each plaintiff also had an account on Facebook, the popular social-media network.  (Id. ¶¶ 51, 56, 61.)  According to the Complaint, HGTV transmitted to Facebook information that allowed Facebook to identify which videos each plaintiff had viewed on hgtv.com.  (Id. ¶¶ 3, 34, 40.)  Facebook allegedly tracked viewing activity through the Facebook Tracking Pixel (the "Pixel"), which is a string of code

embedded on hgtv.com that collects information including the visitor's IP address and information about the web browser.  (Id. ¶ 12.)  For visitors with an active Facebook account, the visitor's browser also transmits a "c_user" cookie to Facebook, which contains the visitor's unencrypted Facebook ID, among other categories of information.  (Id. ¶ 24.)  HGTV also enables "Automatic Advanced Matching," which permits the Pixel to scan the website for a "recognizable form field" where a user has entered information like first name, last name and email.  (Id. ¶ 35.)  According to plaintiffs, the Pixel and the c_user cookie disclose information to Facebook that is sufficient for an ordinary person to identify a specific individual's video-viewing activities, including the videos watched.[1]  (Id. ¶¶ 45-46.)

The Complaint brings one claim under the VPPA.  (Id. ¶¶ 80-89.)  It asserts that under the VPPA, plaintiffs "are 'consumers' because they subscribed to HGTV's newsletter."  (Id. ¶ 83.)  It also asserts that plaintiffs knowingly disclosed plaintiff's video-viewing activities to Facebook in order to build HGTV's audience on Facebook and reach them with targeted advertising.  (Id. ¶ 86.)  The Complaint seeks statutory damages and injunctive relief.  (Id. p. 24.)

HGTV'S MOTION TO DISMISS FOR LACK OF ARTICLE III STANDING IS DENIED.

The Court first addresses the threshold issue of Article III standing.  HGTV argues that plaintiffs have not alleged a concrete injury that satisfies the standing requirement of TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2204 (2021), and that the Complaint should therefore be dismissed under Rule 12(b)(1).  Because the Complaint alleges a concrete injury that is fairly traceable to HGTV and is capable of redress, the motion will be denied.

---

[1] The Complaint also provides details about types of cookies that are specific to visitors who do not have a Facebook account or who are logged out of an account.  (Id. ¶¶ 25-31, 47.)  Because all plaintiffs are alleged to have had a Facebook account, the Court does not need to summarize the functions of fr cookies and _fbp cookies.

- 3 -

"Under Article III of the U.S. Constitution, '[t]he judicial Power of the United States' extends only to certain 'Cases' and 'Controversies.'" Lacewell v. Office of Comptroller of Currency, 999 F.3d 130, 141 (2d Cir. 2021) (quoting U.S. Const. art. III §§ 1-2). "To satisfy the Constitution's 'case-or-controversy requirement,' a plaintiff in federal court 'must establish that they have standing to sue.'" Id. (quoting Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408 (2013)). "The requirements of Article III standing are well established: '[A] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" Id. (quoting Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016)).

"As the party invoking federal jurisdiction, the plaintiffs bear the burden of demonstrating that they have standing." TransUnion, 141 S. Ct. at 2207. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (quotation marks and alteration omitted). Where, as here, a Rule 12(b)(1) motion challenges standing on the face of the pleadings and does not rely on outside evidence, "[t]he task of the district court is to determine whether the Pleading alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016) (quotation marks and brackets omitted).

TransUnion held that even where a federal statute provides for a right of action and statutory damages, the plaintiff does not have Article III standing unless plaintiff identifies a concrete harm that bears a "close relationship to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts . . . ." 141 S. Ct. at 2204. In addition to physical injury

and monetary loss, the TransUnion court noted that traditionally recognized harms include "reputational harms, disclosure of private information, and intrusion upon seclusion." Id. In TransUnion, two categories of plaintiffs brought claims directed toward reports in defendant's credit-report files that falsely labeled them as potential terrorists. Id. at 2208. The Supreme Court concluded that plaintiffs whose information was disclosed to a third party suffered a concrete harm, but plaintiffs whose negative information was never disclosed to a third party did not suffer a concrete harm and therefore lacked standing. Id. at 2209-13. Those plaintiffs who claimed that they received credit reports in formats that did not match statutory formatting requirements also did not demonstrate concrete harm. Id. at 2213-14. A legal entitlement to statutory damages and the assertion that a defendant failed to comply with a regulatory obligation "are not grounds for Article III standing." Id. at 2206.

"[T]he TransUnion decision substantially and materially changed a district court's analysis of Article III standing in statutory consumer law cases." Ciccone v. Cavalry Portfolio Servs., LLC, 2021 WL 5591725, at *3 (E.D.N.Y. Nov. 29, 2021) (Seybert, J.) (quotation marks omitted); accord Sputz v. Alltran Fin., LP, 2021 WL 5772033, at *3 (S.D.N.Y. Dec. 5, 2021) ("TransUnion and cases decided since demonstrate that, where a key element of the analogous common-law or historical harm is missing, the plaintiff lacks standing.") (Seibel, J.) (quotation marks omitted).

Judge Cote recently concluded that a VPPA claim alleged a concrete injury where plaintiff's video-watching activity on people.com was purportedly disclosed to Facebook, noting that TransUnion cited the disclosure of private information as a type of traditional harm capable of redress. Martin v. Meredith Corp., 2023 WL 2118074, at *2 (S.D.N.Y. Feb. 17, 2023); see also Pratt v. KSE Sportsman Media, Inc., 586 F. Supp. 3d 666, 678 (E.D. Mich. 2022) (plaintiffs

identified a concrete harm under a state law analog to the VPPA by alleging that defendants "violated Plaintiffs' statutorily conferred right to privacy in their reading habits—an intangible harm presenting ample constitutional mooring for Article III purposes.").

The Complaint asserts that HGTV intentionally disclosed plaintiffs' personally identifiable information to Facebook without their knowledge and consent. (Compl't ¶¶ 55, 60, 65, 84, 86-87.) As noted in TransUnion and Judge Cote's decision in Martin, disclosure of private information is a harm that courts have traditionally considered to be redressable.[2] Therefore, at the pleading stage, defendants' alleged disclosure of plaintiffs' personal information and viewing activities describes traditionally recognized harm. HGTV's motion to dismiss on standing grounds will therefore be denied.

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may

---

[2] TransUnion also considered plaintiffs' standing in light of a jury verdict and trial record, by which point the plaintiff must satisfy an evidentiary burden to demonstrate concrete harm. See TransUnion, 141 S. Ct. at 2208 ("in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial.") (quotation marks omitted). The burden to demonstrate standing based on a facial challenge to the pleadings is less onerous. Carter, 822 F.3d at 56 (plaintiff's burden to demonstrate standing is commensurate to the stage of litigation).

take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (quoting Conopco, Inc. v. Roll Int'l, 231 F.3d 82, 86 (2d Cir. 2000)).

DISCUSSION.

    I.    The Complaint Does Not Plausibly Allege that
Plaintiffs Are Subscribers of hgtv.com.

    A. Defining a "Subscriber" under the VPPA.

The VPPA states that "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider shall be liable to the aggrieved person . . . ." 18 U.S.C. § 2710(b)(1). It defines "consumer" as "any renter, purchaser, or subscriber of goods or services from a video tape service provider . . . ." Id. § 2710(a)(1). At the pleading stage, there is no dispute that HGTV is "a video tape service provider," which is defined as "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . . ." Id. § 2710(a)(4). The VPPA is directed to the unauthorized disclosure of "personally identifiable information," which "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider . . . ." Id. § 2710(a)(3).

The VPPA was enacted after "the publication in 'a weekly newspaper in Washington' of a 'profile of Judge Robert H. Bork based on the titles of 146 films his family had rented from a video store.'" Robinson v. Disney Online, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015) (Abrams, J.) (quoting Senate Report 100-599, at 5 (1988)). It "'creates a private right of action for plaintiffs to sue persons who disclose information about their video-watching habits.'"

- 7 -

Martin, 2023 WL 2118074, at *3 (quoting In re Nickelodeon Consumer Privacy Litig., 827 F.3d 262, 278 (3d Cir. 2016)).

HGTV urges that the Complaint should be dismissed because plaintiffs do not allege facts showing that they fall within the statute's definition of a "consumer." There is no suggestion that plaintiffs purchased or rented a covered good or service from HGTV. Plaintiffs' claim turns on whether their subscriptions to HGTV newsletters make them "subscribers" of a good or service covered by the VPPA. HGTV argues that the newsletters were distinct from plaintiffs' video-streaming activities, and that, for the purposes of the VPPA, plaintiffs do not plausibly allege that they were subscribers.

"Subscriber" is not a separately defined term under the VPPA. In evaluating whether a plaintiff is a subscriber, courts have looked to dictionary definitions. "Conventionally, 'subscription' entails an exchange between subscriber and provider whereby the subscriber imparts money and/or personal information in order to receive a future and recurrent benefit, whether that benefit comprises, for instance, periodical magazines, club membership, cable services, or email updates." Austin-Spearman v. AMC Network Ent. LLC, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) (Buchwald, J.) (collecting dictionary definitions); see also Ellis v. Cartoon Network, Inc., 803 F.3d 1251, 1256 (11th Cir. 2015) ("'subscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity. As one district court succinctly put it: 'Subscriptions involve some or [most] of the following [factors]: payment, registration, commitment, delivery, [expressed association,] and/or access to restricted content.'") (quoting Yershov v. Gannett Satellite Info. Network, Inc., 104 F. Supp. 3d 135, 147 (D. Mass. 2015) ("Yershov I"), rev'd, 820 F.3d 482, 487 (1st Cir. 2016) (Yershov II) ("More on point technologically, another dictionary defines 'subscribe' as '[t]o receive or be

- 8 -

allowed to access electronic texts or services by subscription' with 'subscription' defined, in turn, to include '[a]n agreement to receive or be given access to electronic texts or services.'") (quoting The American Heritage Dictionary 1726 (4th ed. 2000)). A plaintiff's subscriber status may be straightforward. In Czarnionka v. Epoch Times Association, Inc., 2022 WL 17069810, at *1 (S.D.N.Y. Nov. 17, 2022), viewers accessed defendant's website by registering "with their name, email address, and billing information." The defendant did not dispute that plaintiff subscribed to its website. (See 22 Civ. 6348 (AKH), ECF 18 at 1.)

Similar to this case, the Austin-Spearman plaintiff asserted that AMC violated the VPPA by disclosing to Facebook her Facebook user ID and information about video clips of the channel's "The Walking Dead" zombie series, which she streamed on an AMC website. Id. at 664. The plaintiff's interactions with the AMC site were "casual." Id. at 669. She made no payment to AMC, did not create a profile or register an account, and was able to view or not view AMC videos without obligation. Id. at 669. Judge Buchwald concluded that "an individual must do more than simply take advantage of a provided service – even if doing so alone allows a provider to access her information – in order to have acted as a 'subscriber' of the provider." Id. at 671. Because the plaintiff did not plausibly allege that she was a "subscriber" to the AMC site and therefore a "consumer," her VPPA claim was dismissed.³ Id.

Plaintiffs' allegations in this case are directed to videos accessed through a web browser and not a dedicated mobile app downloaded to a user's device. The Eleventh Circuit and the First Circuit reached opposing conclusions about whether downloading a mobile app was enough to plausibly allege subscriber status. The Eleventh Circuit held that "downloading an

---

³ In granting plaintiff's application for leave to replead, Judge Buchwald noted that she was "skeptical" of plaintiff's new theory that subscribing to a newsletter that was "distinct and set apart from [defendant's] provision of videos" could make plaintiff a subscriber under the VPPA. 98 F. Supp. 3d at 671.

app for free and using it to view content at no cost is not enough to make a user of the app a 'subscriber' under the VPPA, as there is no ongoing commitment or relationship between the user and the entity which owns and operates the app.  Importantly, such a user is free to delete the app without consequences whenever he likes, and never access its content again."  Ellis, 803 F.3d at 1257.  In Yershov II, by contrast, the First Circuit concluded that by downloading a mobile app to access USA Today, the plaintiff used a direct channel to receive text and video, similar to a newspaper subscriber who signed up for at-home delivery instead of purchasing the day's paper at a store.  820 F.3d at 487.  While the plaintiff did not pay for the app, plaintiff's geographic location and device ID were disclosed in exchange for content, which the First Circuit concluded was enough to allege plaintiff's status as a subscriber.  Id. at 489.

Here, plaintiffs assert that their subscriptions to hgtv.com newsletters make them subscribers under the VPPA.  Their broad interpretation of "subscriber" has support only if the definition of a "consumer" is read in isolation.  The VPPA defines "consumer" as a "renter, purchaser, or subscriber of goods or services from a video tape service provider . . . ."  18 U.S.C. § 2710(a)(1).  The statute does not limit or qualify "goods or services" to video materials.  The Court takes judicial notice that hgtv.com includes an online shop that recommends and links to third-party home-and-garden products, and discloses that "we may make money from these affiliate links."[4]  Plaintiffs' interpretation, taken to its logical end, likely would entitle a visitor who purchases a "Tulip Tile Trinket Box" using an hgtv.com affiliate link to video-streaming privacy protections not extended to otherwise-similar site visitors.

---

[4] "[A] court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute . . . ."  Hesse v. Godiva Chocolatier, Inc., 463 F. Supp. 3d 453, 463 (S.D.N.Y. 2020) (Nathan, J.).

"In interpreting a statute . . . courts are not to construe each phrase literally or in isolation." Federal Housing Finance Agency v. UBS Americas Inc., 712 F.3d 136, 141 (2d Cir. 2013) (quotation marks omitted).  Courts must "ascertain how a reasonable reader would understand the statutory text, considered as a whole," and if the text remains ambiguous, consult legislative history and other interpretative tools.  Id. (quotation marks omitted).

In the statute's full context, a reasonable reader would understand the definition of "consumer" to apply to a renter, purchaser or subscriber of audio-visual goods or services, and not goods or services writ large.  The VPPA makes it unlawful for a "video tape service provider" to "knowingly disclose[ ], to any person, personally identifiable information concerning any <u>consumer of such provider</u> . . . ." 18 U.S.C. § 2710(b)(1) (emphasis added).  A "video tape service provider" is defined as a person "engaged in the business . . . of rental, sale or delivery of prerecorded video cassette tapes or similar audio visual materials . . . ." Id. § 2710(a)(4).  Thus, subsection (b)(1) provides a right of action to a "consumer" (e.g., "renter, purchaser, or subscriber") of "such provider" (e.g., one engaged in "the business . . . of rental, sale or delivery of . . . audio visual materials").  The definitions of "consumer" and "video tape service provider" are paired to some degree: renter with rental, purchaser with sale, and subscriber with delivery, all of which subsection (a)(4) applies to audio visual materials.  Thus, the scope of a "consumer," when read with sections 2710(b)(1) and (a)(4), is cabined by the definition of "video tape service provider," with its focus on the rental, sale or delivery of audio visual materials.  Section 2710(b)(1) provides for an action by a renter, purchaser of subscriber of audio visual materials, and not a broader category of consumers.

While the Court need not rely on statutory history, its interpretation has some support from the Senate's stated intent.  The 1988 Senate Report notes that the definition of PII

- 11 -

at section 2710(a)(3) is drafted "to make clear that simply because a business is engaged in the sale or rental of video materials or services does not mean that all of its products or services are within the scope of the bill.  For example, a department store that sells video tapes would be required to extend privacy protection to only those transactions involving the purchase of video tapes and not other products."  Senate Report 100-599, at 12.  This reflects an intent that a customer's non-video transactions play no part in a defendant's liability under the VPPA.

>    B.  Plaintiffs' Newsletter Subscriptions Do Not Make
>        them "Subscribers" Covered by the VPPA.

The Complaint describes plaintiffs as subscribers of hgtv.com newsletters, but does not plausibly allege that they were subscribers of hgtv.com video services, which are not alleged to entail any commitment from viewers.

The Complaint asserts that plaintiffs subscribed to hgtv.com newsletters by entering an email address and choosing from among eight different newsletters, each of which had a different theme.  (Compl't ¶ 42.)  It states: "The principal purpose of the newsletter is to drive traffic to HGTV's website.  The overwhelming amount of content featured in the newsletter links back to articles and videos on hgtv.com."  (Id. ¶ 43.)  Each plaintiff alleges that she both subscribed to an HGTV newsletter and watched videos on the website.  (Id. ¶¶ 52, 57, 62.)  The Complaint also states that HGTV "solicits individuals to subscribe to their newsletter that advertises and promotes videos and articles on [the Website]."  (Id. ¶ 82.)

The Complaint plausibly alleges that the three plaintiffs subscribed to hgtv.com newsletters.  But the Complaint does not include facts that plausibly allege that their status as newsletter subscribers was a condition to accessing the site's videos, or that it enhanced or in any way affected their viewing experience.  They were subscribers to newsletters, not subscribers to audio visual materials.

The Complaint describes the newsletters as advertisements for hgtv.com videos and articles. (Id.) Such newsletters are little different from any digital or analog subscription publication – whether a Substack email or a print edition of *New York* magazine – that includes advertisements for films or videos.

Plaintiffs do not assert that they watched videos embedded in the newsletters themselves. The newsletters may entice or encourage recipients to view hgtv.com videos, but there is no assertion that a newsletter subscription was required to access those videos, functioned as a login, or gave newsletter subscribers extra benefits as viewers. Plaintiffs were free to watch or not watch hgtv.com videos without any type of obligation, no different than any of the other 9.9 million monthly visitors to the site.

Because the Complaint does not plausibly allege that plaintiffs acted as "subscribers" when they viewed videos on the hgtv.com, it does not plausibly allege that they were "consumers" under the VPPA. The claim will therefore be dismissed.

> II. The Court Need Not Reach the Issue of Whether the Data Sent to Facebook Disclosed Plaintiffs' Personally Identifying Information ("PII").

HGTV separately urges that the motion to dismiss should be granted because the Complaint does not plausibly allege that the data transmitted to Facebook includes the type of identifying information that is actionable under the VPPA. As just explained, because the Complaint does not plausibly allege that any plaintiff viewed videos in a subscriber capacity, it fails to allege that any plaintiff is a "consumer" that is afforded protection under the statute. The Court therefore need not reach whether the information alleged transmitted from hgtv.com to Facebook – including Facebook ID, IP address and videos watched – are plausibly alleged to be PII.

CONCLUSION.

        Defendant's motion to dismiss is GRANTED. The Clerk is respectfully directed to terminate the motion. (ECF 28.)

        SO ORDERED.

                                                */s/ P. Kevin Castel*
                                                  P. Kevin Castel
                                            United States District Judge

Dated: New York, New York
       April 24, 2023