Adam E. Polk (SBN 273000)
Simon Grille (SBN 294914)
Reid Gaa (SBN 330141)
Anthony Rogari (SBN 353784)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
apolk@girardsharp.com
sgrille@girardsharp.com
rgaa@girardsharp.com
arogari@girardsharp.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAN MARKELS, ALLEN ZIMAN, WILLIAM MARTIN, and LYNN SEDA, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> AARP, <br><br> Defendant. | Case No. 4:22-cv-05499-YGR <br><br> **JURY DEMAND** <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs Jan Markels, Allen Ziman, William Martin, and Lynn Seda, on behalf of themselves and all others similarly situated, allege as follows.

## INTRODUCTION

1.     This is a consumer privacy class action against AARP for violating the Video Privacy Protection Act ("VPPA" or "the Act") and California law by disclosing its digital subscribers' identities and video-viewing preferences to Meta Platforms, Inc. ("Meta") without proper consent.

2.     AARP's operations model relies in large part on providing a wide variety of prerecorded video content to paying subscribers like Plaintiffs. AARP features thousands of videos on its website, many of which contain information about particularly sensitive topics related to aging and serious health conditions. It directs a significant portion of its operations to producing and delivering prerecorded video content online and is substantially involved in creating and maintaining its own prerecorded video content, including through AARP Studios, its in-house video production entity. Further, AARP derives substantial revenues from the prerecorded video content on its website, both by promoting members-only content to attract and retain subscribers and by selling advertising space associated with that content to businesses.

3.     The VPPA prohibits "video tape service providers," such as AARP, from knowingly disclosing consumers' personally identifiable information ("PII"), including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider," without the person having expressly given consent in a standalone consent form.

4.     AARP collects and shares users' personal information with Meta using a "Meta Pixel" or "Pixel." A Meta Pixel is a snippet of programming code that tracks users as they navigate through a website, including what searches they performed and which items they have clicked on or viewed.

5.     The Meta Pixel sends information to Meta in a data packet containing PII, such as the users' IP address, name, email, or phone number. Meta, which owns the popular social media

platforms Facebook and Instagram, then stores this data on its own servers.

6.    Because it incorporated the Meta Pixel onto its website, AARP shares PII with Meta that includes at least the user's Facebook Profile ID and the title of the video that the user watched. A user's Facebook Profile ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details.

7.    AARP discloses the user's Facebook Profile ID and viewing content to Meta together in a single, unencrypted transmission in violation of the VPPA. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any other person—can use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile. In other words, the Pixel allows Meta to know what video content one of its subscribers viewed on AARP's website.

8.    Plaintiffs are AARP subscribers and, thus, consumers entitled to the VPPA's protections including because, in exchange for their annual membership fees, they received access to prerecorded video content and programming that is not available to the general public. Among other exclusive benefits, AARP gives Plaintiffs and other AARP subscribers access to members-only video content and exclusive discounts for on-demand classes and presentations, such as driver safety courses for seniors, taking the form of prerecorded video content.

9.    In contravention of the VPPA, AARP does not require subscribers like Plaintiffs to consent in a standalone consent form to its dissemination of their viewing content, along with their Facebook Profile IDs, to a third party. Consequently, by disclosing this information to Meta, AARP violates the VPPA.

10.    On behalf of a Class of similarly situated AARP users, Plaintiffs seek relief through this action. The facts set forth in this Complaint establish that AARP violated both the VPPA and California's Unfair Competition Law ("UCL").

## PARTIES

11.    Plaintiff Jan Markels is a citizen and resident of San Francisco, California.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-05499-YGR

12.     Plaintiff Allen Ziman is a citizen and resident of Warwick, Rhode Island.

13.     Plaintiff William Martin is a citizen and resident of Huntington Beach, California.

14.     Plaintiff Lynn Seda is a citizen and resident of Redlands, California.

15.     Defendant AARP is a Washington, D.C. corporation headquartered at 601 E Street, NW, Washington, D.C. 20049.

## DIVISIONAL ASSIGNMENT

16.     Pursuant to Civil L.R. 3-5(b), assignment to the Oakland Division is appropriate under Civil L.R. 3-2(c) because at least one plaintiff is domiciled in San Francisco and a substantial part of the conduct at issue in this case occurred in San Francisco County.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710.

18.     This Court also has jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

19.     This Court has personal jurisdiction over AARP because AARP has sufficient minimum contacts in California to render the exercise of jurisdiction by this Court proper and necessary. AARP continuously and systematically conducts business in California. Additionally, AARP's violations occurred in part in California as AARP collected and shared information that is the subject of this action from California Plaintiffs' devices while they were in California.

20.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### Jan Markels

21.     Plaintiff Markels used his internet-connected devices and the browser installed on

3

those devices to visit and watch prerecorded video content on AARP's website, https://www.aarp.org, during the Class Period as defined herein.

22.     Mr. Markels is an AARP member and subscriber, who pays approximately $16 per year in AARP subscription fees.

23.     Mr. Markels provided AARP with his PII, including at least his name and address, when subscribing to its services.

24.     Mr. Markels has maintained a Facebook account for approximately 14 years and spends approximately 30 minutes per day on Facebook. His Facebook profile includes personal information about him including his name and other personal details.

25.     Mr. Markels visited the AARP website using his web browser to view prerecorded video content.

26.     After joining AARP, Mr. Markels accessed prerecorded video content on AARP's website that is not available to non-members, including on-demand classes and programs.

27.     Mr. Markels also participated in AARP Rewards, viewed video content on the AARP website in order to obtain AARP Rewards points, and redeemed points for contest entries and other prizes.

28.     Mr. Markels receives daily and weekly emails from AARP, with links to video content and other benefits, including members-only videos.

29.     Mr. Markels requests and watches videos on AARP using the same browser that he uses to log in to Facebook, including while he is logged in to Facebook. He uses the same device to request and watch videos on AARP that he uses for Facebook.

30.     AARP transmitted to Meta Mr. Markels's PII, including his Facebook Profile ID, as well as the title of each video he viewed, without obtaining his consent through a standalone consent form.

31.     Mr. Markels's PII and viewing history are private and confidential in nature and information to which no third party has a presumptive right to access without his clear, informed consent.

**Allen Ziman**

32.    Plaintiff Ziman used his internet-connected devices and the browser installed on those devices to visit and watch prerecorded video content on AARP's website, https://www.aarp.org, during the Class Period.

33.    Mr. Ziman is an AARP member and subscriber, who pays approximately $16 per year in AARP subscription fees.

34.    Mr. Ziman provided AARP with his PII, including his name, email address, and date of birth, when subscribing to its services.

35.    The ability to watch AARP's subscriber-only video content was an important factor in Mr. Ziman's decision to subscribe.

36.    Mr. Ziman has maintained a Facebook account for approximately seven years and spends approximately two hours per day on Facebook. His Facebook profile includes personal information about him including his name and other personal details.

37.    Mr. Ziman visited the AARP website using his web browser to view video content.

38.    After joining AARP, Mr. Ziman accessed prerecorded video content on AARP's website that was not available to non-members, including on-demand classes and programs.

39.    Mr. Ziman also participated in AARP Rewards, viewed video content on the AARP website in order to obtain AARP Rewards points, and redeemed points for contest entries and other prizes.

40.    Mr. Ziman receives weekly emails from AARP, with links to prerecorded video content and other benefits, including members-only videos.

41.    Mr. Ziman requests and watches videos on AARP using the same browser that he uses to log in to Facebook, including while he is logged in to Facebook. He uses the same device to request and watch videos on AARP that he uses for Facebook.

42.    AARP transmitted to Meta Mr. Ziman's PII, including his Facebook Profile ID, as well as the title of each video he viewed, without obtaining his consent through a standalone consent form.

43.     Mr. Ziman's PII and viewing history are private and confidential in nature and information to which no third party has a presumptive right to access without his clear, informed consent.

**William Martin**

44.     Plaintiff Martin used his internet-connected devices and the browser installed on those devices to visit and watch prerecorded video content on AARP's website, https://www.aarp.org, during the Class Period.

45.     Mr. Martin is an AARP member and subscriber, who pays approximately $16 per year in AARP subscription fees.

46.     Mr. Martin provided AARP with his PII, including his name, email address, and date of birth, when subscribing to its services.

47.     The ability to watch AARP's subscriber-only video content was an important factor in Mr. Martin's decision to subscribe.

48.     Mr. Martin has maintained a Facebook account for approximately 14 years and spends approximately ten to fifteen minutes per day on Facebook. His Facebook profile includes personal information about him including his name and other personal details.

49.     Mr. Martin visited the AARP website using his web browser to view video content.

50.     After joining AARP, Mr. Martin accessed prerecorded video content on AARP's website that was unavailable to non-members.

51.     Mr. Martin also participated in AARP Rewards, viewed video content on the AARP website in order to obtain AARP Rewards points, and redeemed points for contest entries and other prizes.

52.     Mr. Martin receives weekly emails from AARP, with links to prerecorded video content and other benefits, including members-only videos.

53.     Mr. Martin requests and watches videos on AARP using the same browser that he uses to log in to Facebook, including while he is logged in to Facebook. He uses the same device to request and watch videos on AARP that he uses for Facebook.

54.    AARP transmitted to Meta Mr. Martin's PII, including his Facebook Profile ID, as well as the title of each video he viewed, without obtaining his consent through a standalone consent form.

55.    Plaintiff Martin's PII and viewing history are private and confidential in nature and information to which no third party has a presumptive right to access without his clear, informed consent.

**Lynn Seda**

56.    Plaintiff Seda used her internet-connected devices and the browser installed on those devices to visit and watch prerecorded video content on AARP's website, https://www.aarp.org, during the Class Period.

57.    Ms. Seda is an AARP member and subscriber, who paid approximately $45 in fees for a five-year AARP subscription.

58.    Ms. Seda provided AARP with her PII, including her name, email address, and date of birth, when subscribing to its services.

59.    Ms. Seda has maintained a Facebook account for approximately thirteen years and accesses Facebook about once per month. Her Facebook profile includes personal information about her including her name and other personal details.

60.    Ms. Seda visited the AARP website using her web browser to view video content.

61.    After joining AARP, Ms. Seda accessed prerecorded video content on AARP's website that was unavailable to non-members.

62.    Ms. Seda also participated in AARP Rewards, viewed video content on the AARP website in order to obtain AARP Rewards points, and redeemed points for contest entries and other prizes.

63.    Ms. Seda receives daily and weekly emails from AARP, with links to prerecorded video content and other benefits, including members-only videos.

64.    Ms. Seda requests and watches videos on AARP using the same browser that she uses to log in to Facebook, including while she is logged in to Facebook. She uses the same device

to request and watch videos on AARP that she uses for Facebook.

65.     AARP transmitted to Meta Ms. Seda's PII, including her Facebook Profile ID, as well as the title of each video she viewed, without obtaining her consent through a standalone consent form.

66.     Ms. Seda's PII and viewing history are private and confidential in nature and information to which no third party has a presumptive right to access without her clear, informed consent.

## COMMON ALLEGATIONS

**A.     AARP is engaged in the business of delivering audio visual materials.**

67.     AARP is a subscription-based organization for people over the age of 50. Membership requires an annual subscription fee that automatically renews each year.

68.     AARP's website includes information on various topics such as health, money, and entertainment. This information is provided in a variety of forms, including prerecorded videos, short-form articles, podcasts, quizzes, and games.

69.     AARP provides prerecorded audiovisual content on its website to its members, which Plaintiffs requested and viewed.

70.     The prerecorded video content on AARP's website includes daily news recaps, fitness and exercise videos, informational videos about Social Security and Medicare, videos about recognizing serious medical conditions, and multi-episode TV series, among other subjects. In total, AARP features nearly 5,000 videos on its website.[1]

71.     Many of these videos contain information on sensitive issues, including topics associated with aging (like dementia and Alzheimer's), serious health conditions, and family caregiving.

72.     AARP members obtain access to additional prerecorded video content and programming that is not available to the general public.

---

[1] https://videos.aarp.org/category/videos/all-videos (last visited June 13, 2024).

73.     Exclusive prerecorded video content for AARP members includes specially curated AARP entertainment content; fitness, meditation, and lifestyle videos; full-length movies; interview videos with celebrities and best-selling authors; and on-demand video classes and presentations, such as driver safety courses for seniors.

74.     AARP highlights access to members-only prerecorded video content in its marketing materials and communications with members. For example, the AARP Member Benefits Guide touts "[m]embers-only films" as one of the exclusive benefits of becoming a member by paying for an online account.[2] (See image below.)



75.     Moreover, AARP sends weekly emails to members with links to prerecorded video content, including members-only videos.

76.     AARP offers various online and on-demand programs and classes—which incorporate prerecorded video content—for purchase, such as AARP Online Fitness, the AARP

---

[2] https://www.aarp.org/content/dam/aarp/benefits_discounts/documents/aarp-member-benefits-guide.pdf?intcmp=DSO-MEM-HUB-MBG1 (last visited June 13, 2024).

Smart Driver course, and AARP Skills Builder for Work. AARP gives members exclusive discounts for these video programs and classes, which require an AARP log-in to watch.

77.     AARP promotes these courses and the discounted rates for members on its website and through emails sent directly to members.

78.     AARP further encourages members to watch certain videos by offering "AARP Rewards" points, which can be redeemed for contest entries, discounted gift cards, and other prizes.

79.     Members can earn AARP Rewards points by watching specific prerecorded video content (including some members-only videos), playing games, and taking quizzes. AARP members who sign up for AARP Rewards receive additional benefits, compared to non-members, for watching qualifying prerecorded video content. For example, AARP members earn "50% more AARP Rewards points" than non-members, which members can then redeem for members-only content.

80.     AARP promotes the AARP Rewards program and the exclusive members-only benefits in its marketing materials and in direct communications with members. For instance, the AARP Member Benefits Guide highlights that members earn "50% more AARP Rewards points" and can "access members-only rewards and experiences."[3] (See image above.) Emails sent by AARP to members concerning AARP Rewards link to qualifying videos and showcase special rewards items.

81.     AARP directs a significant portion of its operations to producing and delivering prerecorded video content online. AARP is substantially involved in creating and maintaining the prerecorded video content that it provides to members and non-members, including through AARP Studios, AARP's in-house production entity.

82.     AARP Studios produces feature-length films, documentaries, and digital series of shows. In recent years, AARP Studios has released multiple original full-length films and

---

[3] *Id.*

documentaries.[4] AARP Studios also has produced multi-episode digital series on a variety of topics, including a celebrity interview series hosted by Don Rickles and a documentary series on military veterans and service members.[5] AARP Studios' productions have garnered millions of views[6] and even won a New York Emmy Award for original short film.[7]

83.    AARP derives substantial revenues from the prerecorded video content it produces on its website. It promotes members-only prerecorded video content both to attract and retain paying AARP members. It also monetizes the prerecorded video content on its website by selling advertising space before members-only videos—known as "pre-roll ads"—to businesses.

84.    Additionally, AARP tracks the online activities of its users, including their video browsing, in order to deliver targeted content and optimize its advertising revenue.

85.    AARP highlights its prerecorded video content in promotional materials to advertisers. AARP's marketing materials for its video content stress the significant increase in video consumption among AARP members and emphasize the use of first-party data to optimize and target advertising.[8] For example, AARP touts that "[v]ideo consumption is up 43% among AARP members" and advertises that its Video Everywhere platform "leverages AARP's first-party data . . . to expand reach and amplify advertisers' video."[9]

---

[4] https://www.aarp.org/about-aarp/purpose-prize/hidden-power-of-purpose-film.html (last visited June 13, 2024); https://www.aarp.org/caregiving/stories/info-2018/care-to-laugh-jesus-trejo.html?CMP=RDRCT-CON-CAREGIVING-071818 (last visited June 13, 2024).

[5] https://www.aarp.org/entertainment/celebrities/info-2017/dinner-with-don-rickles.html (last visited June 13, 2024); https://www.aarp.org/home-family/voices/veterans/info-2022/angela-salinas-reporting-for-duty.html (last visited June 13, 2024).

[6] https://blog.aarp.org/aarp-media-relations/vote-today-dinner-with-don-series-nominated-for-2018-webby-award (last visited June 13, 2024); https://blog.aarp.org/aarp-media-relations/aarp-wins-sharecare-award-for-video-celebrating-men-as-family-caregivers (last visited June 13, 2024).

[7] https://blog.aarp.org/fighting-for-you/emmy-andantes-motowns-secret-blend (last visited June 13, 2024).

[8] https://advertise.aarp.org/aarp-media/video (last visited June 13, 2024).

[9] *Id.*

---

11

**B.    AARP disclosed Plaintiffs' and Class members' private video-viewing information to Meta.**

86.    While Plaintiffs and Class members were viewing prerecorded video content on AARP's website, AARP transmitted their video-viewing information to Meta.

87.    AARP's transmission of information to Meta included the specific names of video content viewed by users, as well as the user's Facebook Profile ID ("FID"), a string of numbers unique to each Facebook profile that personally identifies the user.

88.    Anyone who possesses an FID may use this number to quickly and easily locate, access, and view the corresponding Facebook profile by simply visiting www.facebook.com/[the user's FID]. Facebook profiles contain large amounts of personal information.

89.    A Facebook profile typically shows the Facebook user's name, gender, place of residence, career, educational history, a multitude of photos, and the content of the user's posts. This information may reveal even more sensitive personal information; posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

90.    Just as Meta can easily identify any individual on its Facebook platform with only their unique FID, so too can any ordinary person who comes into possession of a FID. Facebook admits this capability on its website. Thus, equipped with a FID and the video content name and URL—all of which AARP provides to Meta without appropriate consent from its members—any ordinary person can determine the identity of the AARP member and the specific video or media content they viewed on AARP's website.

91.    AARP transmitted the video title and Facebook Profile ID information in a single, unencrypted transmission, through an invisible tracking tool called a "Meta Pixel." A Meta Pixel is a snippet of programming code that, once installed on a website, sends information to Meta. This transmission occurs when a member views a prerecorded video on AARP's website.

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-05499-YGR

92.     The screenshots below show the means of AARP's transmission of this PII. The "c-user" value highlighted in the first screenshot is the Facebook Profile ID. The second screenshot highlights the full title of the requested video being transmitted to Meta.



SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-05499-YGR

93.    Hence, when an AARP member visits an AARP webpage and requests a prerecorded video, the Pixel transmits to Meta both the member's FID and the title of the video—information highlighted, respectively, in the red boxes above.

94.    The Pixel is an advertising tool that allows website owners to track visitor actions on their websites for the purposes of sending the corresponding information to Meta; websites use the Pixel in hopes of better targeting their products and services on Facebook to interested customers. Accordingly, an organization such as AARP chooses to install the Pixel on its website in order to increase membership and revenue.

95.    According to Meta's website, the Pixel allows it "to match your website visitors to their respective Facebook User account" and that "[o]nce matched, we can tally their actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns."[10]

96.    AARP knew that by installing the Pixel on its website, the Pixel would send Meta information identifying its members and their video-watching habits. Meta's website explains that, to begin using the Meta Pixel, a business must first "install" the Pixel "by placing the Meta Pixel base code on all pages of your website."[11] AARP made the conscious decision to undertake this installation process.

97.    Further demonstrating that AARP knowingly placed the Pixel in its website code, Meta's own website states that "[d]evelopers and marketers can *optionally choose* to send information about" a visitor's activity on its website. (Emphasis added).[12]

98.    Meta offers its Pixel tool to websites across the internet, and benefits from websites like AARP installing its Pixel. When the Pixel is installed on a business's website, the business has a greater incentive to advertise through Facebook or other Meta-owned platforms, like

---

[10] https://developers.facebook.com/docs/meta-pixel/get-started (last visited June 13, 2024).

[11] *Id.*; https://www.facebook.com/business/tools/meta-pixel/get-started (last visited June 13, 2024).

[12] https://developers.facebook.com/docs/meta-pixel (last visited June 13, 2024).

14

Instagram. In addition, even if the business does not advertise with Meta, the Pixel assists Meta in building more fulsome profiles of its own users, which in turn allows Meta to profit from serving more targeted ads. The Pixel is installed on a variety of websites and provides Meta with information about its users' preferences, other distinguishing traits, and web-browsing activities outside of Meta-owned platforms.

99.    Using the Meta Pixel likewise benefits AARP's business by improving its ability to promote its content and services to its users.

100.    While AARP describes itself as a non-profit, it is the parent of for-profit subsidiaries and affiliates, including AARP Services, Inc. AARP's website states that AARP Services provides "data licensing" and "world-class data mining, advanced analytics and targeting capabilities" and that it helps "build profitable and lasting relationships between brands and consumers by leveraging our deep data insights, innovative tools, and strategic . . . capabilities."[13]

101.    Through use of the Meta Pixel, AARP discloses to Meta the full name of each video a user watched, together with the user's Facebook Profile ID, thus linking users' viewing content choices and preferences to their Facebook profiles. In other words, this single transmission connects a user's video-viewing choices with their Facebook Profile ID.

102.    AARP violates and invades the privacy rights of users with its practice of sending their FIDs, together with their viewing content, to Meta. Plaintiffs and Class members did not consent to AARP's disclosure of their viewing content and their identities to Meta.

103.    The VPPA requires that consent be obtained in a form "distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710. AARP's website includes its Terms of Service and a Privacy Policy, neither of which operates as a standalone consent form disclosing the information shared through the Meta Pixel and requesting user consent. Accordingly, no user provided AARP with the level of consent required by the VPPA for disclosure of their viewing content and identities to Meta.

---

[13] https://www.aarp.org/about-aarp/aarp-services/ (last visited June 13, 2024).

C. **AARP's privacy violations harmed Plaintiffs and Class members.**

104. AARP shared Plaintiffs' personal information with Meta, including their video-viewing histories and associated Facebook Profile IDs, which they reasonably expected would be kept private.

105. The personal information AARP obtained from Plaintiffs and Class members commands value in digital advertising markets dependent upon such consumer information. AARP's acquisition and use of their personal, private information deprived Plaintiffs and Class members of control over that information and prevented them from realizing its full value for themselves.

106. AARP's conduct caused economic harm to Plaintiffs and Class members, who were AARP subscribers during the Class Period, in that they paid subscription fees to AARP for services, including access to exclusive prerecorded video content, that they did not expect would subject them to the practices described herein. Plaintiffs and Class members would not have subscribed to AARP, or would not have paid as much as they did for a subscription, had AARP fully and fairly disclosed its practice of sharing their video-watching behavior with third parties in the manner mandated by the VPPA.

## CLASS ALLEGATIONS

107. Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3), and/or (c)(4) as representatives of the following Class and Subclass:

> **Nationwide Class**: All persons residing in the United States who subscribed to AARP, viewed prerecorded video content on https://www.aarp.org, and used Facebook during the time Meta's Pixel was active on https://www.aarp.org.

> **California Subclass:** All persons residing in California who subscribed to AARP, viewed prerecorded video content on https://www.aarp.org, and used Facebook during the time Meta's Pixel was active on https://www.aarp.org.

108. Excluded from the Class are Defendant, its employees, agents and assigns, and any members of the judiciary to whom this case is assigned, their respective court staff, the members

1   of their immediate families, and Plaintiffs' counsel.

2       109.    The "Class Period" extends from January 1, 2013 to the present.

3       110.    Plaintiffs reserve the right to modify, change, or expand the Class definition based

4   upon discovery and further investigation.

5       111.    **Numerosity**: The Class consists of at least hundreds of thousands of individuals,

6   making joinder impractical.

7       112.    **Commonality and Predominance**: Common questions of law and fact exist with

8   regard to each of the claims and predominate over questions affecting only individual Class

9   members. Questions common to the Class include:

10          a.      Whether AARP's use of the Meta Pixel was without user consent or

11  authorization in a standalone form;

12          b.      Whether AARP obtained and shared, or caused to be obtained and shared,

13  Plaintiffs' and Class members' personal information through tracking relying on the Meta Pixel,

14  installed by AARP on its website;

15          c.      Whether third parties obtained Plaintiffs' and Class members' personal

16  information as a result of AARP's conduct described herein;

17          d.      Whether AARP's conduct violates the Video Privacy Protection Act, 18

18  U.S.C. § 2710, *et seq.*;

19          e.      Whether AARP's conduct violates the Unfair Competition Law, Cal. Bus.

20  and Prof. Code § 17200, *et seq.*;

21          f.      Whether AARP's acquisition and transmission of Plaintiffs' and Class

22  members' personal information caused them harm; and

23          g.      Whether AARP should be enjoined from engaging in such conduct in the

24  future.

25      113.    **Typicality**: Plaintiffs' claims are typical of the claims of the Class members in that

26  Plaintiffs, like all Class members, have been injured by AARP's challenged conduct: disclosure

27  of users' PII and viewing content to Meta without appropriate consent.

114.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiffs do not have any interests antagonistic to those of the Class.

115.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of AARP's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this Complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

116.    **Injunctive relief**: AARP has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## TOLLING OF THE STATUTES OF LIMITATIONS

117.    All applicable statute(s) of limitations have been tolled by AARP's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class members could not have reasonably discovered AARP's practices of sharing their personal viewing content and PII with Meta using a piece of programming code until shortly before this class action litigation commenced.

118.    AARP was and remains under a continuing duty to disclose to Plaintiffs and Class members its practice of sharing personal viewing content and PII to Meta. As a result of the active concealment by AARP, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

1

2

3

**FIRST CAUSE OF ACTION**
**Violation of the Video Privacy Protection Act (the "VPPA")**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of the Nationwide Class)**

4       119.    Plaintiffs incorporate and reallege the above factual allegations by reference.

5       120.    The VPPA prohibits a "video tape service provider" from knowingly disclosing

6   "personally identifiable information" concerning any consumer to a third party without the

7   consumer's "informed, written consent . . . in a form distinct and separate from any form setting

8   forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b).

9       121.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any

10  person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of

11  prerecorded video cassette tapes or similar audiovisual materials." AARP is a "video tape service

12  provider" as defined in 18 U.S.C. § 2710(a)(4) because its operations model substantially relies

13  on creating and providing a range of prerecorded video content to paying subscribers, as

14  demonstrated by the following facts, among others:

15              a.      AARP features thousands of videos on its website.

16              b.      AARP's prerecorded video content concerns, among other subjects, daily

17  news recaps, fitness and exercise videos, videos about recognizing serious medical conditions,

18  on-demand video classes and presentations, and multi-episode TV series and a sizable portion of

19  this prerecorded content is provided exclusively or at discounted rates to members.

20              c.      AARP directs a significant portion of its operations to producing and

21  delivering prerecorded video content online and is substantially involved in creating and

22  maintaining its own video content, including through AARP Studios, its in-house video

23  production entity, which produces a range of prerecorded video content, including feature-length

24  films, documentaries, and multi-episode digital series.

25              d.      AARP derives revenue from the prerecorded video content on its website,

26  both by promoting members-only video content to attract and retain subscribers and by selling

27  advertising space associated with that content to businesses.

122.    As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

123.    AARP knowingly caused personal viewing information, including Facebook Profile IDs, concerning Plaintiffs and Class members to be disclosed to Meta. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to Meta as an individual who viewed AARP's content, including the specific video materials requested and watched on AARP.

124.    As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and Class members are subscribers of AARP who pay approximately $16 per year to subscribe to AARP's services. In exchange for their annual subscription fees, Plaintiffs receive access to AARP's members-only prerecorded video content. This exclusive prerecorded video content includes specially curated AARP entertainment content; fitness, meditation, and lifestyle videos; full-length movies; interview videos with celebrities and best-selling authors; and on-demand video classes and presentations. In addition, AARP gives Plaintiffs and other members exclusive discounts for paid video programs and classes, which likewise incorporate prerecorded video content. AARP also gives Plaintiffs and other AARP members who participate in its loyalty program, AARP Rewards, additional benefits (compared to non-members) for watching its prerecorded video content, including bonus points and exclusive prizes.

125.    As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. AARP failed to obtain informed, written consent that satisfied these statutory requirements.

126.    Additionally, the VPPA creates an opt-out right for consumers in 18 U.S.C.

§ 2710(b)(2)(B)(iii). The Act requires video tape service providers to "provide[] an opportunity, in a clear and conspicuous manner, for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." AARP failed to provide an opportunity to opt out as required by the Act.

127.    AARP was aware that the disclosures to Meta that were shared through the Pixel identified Plaintiffs and Class members. AARP also knew that Plaintiffs' and Class members' personal viewing content was disclosed to Meta because AARP programmed the Meta Pixel into its website code, knowing that Meta would receive video titles and the subscriber's Facebook Profile ID when a user watched a video.

128.    By disclosing Plaintiffs' and Class members' personal viewing content, AARP violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

129.    As a result of the above violations, AARP is liable to Plaintiffs and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "actual damages but not less than liquidated damages in an amount of $2,500" per violation. 18 U.S.C. § 2710(c)(2)(A). Under the Act, AARP is also liable for reasonable attorneys' fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by AARP in the future.

**SECOND CAUSE OF ACTION**
**Violation of California's Unfair Competition Law (the "UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of the California Subclass)**

130.    California Plaintiffs incorporate and reallege the above factual allegations by reference.

131.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

132.    California Plaintiffs bring this cause of action in the alternative to their claim at

law. There is no adequate remedy at law that would provide redress to California Plaintiffs and the California Subclass or ensure that AARP will not deploy the same data practices in the future.

**Unlawful**

133.    A business practice is "unlawful" under the UCL if it violates any other law or regulation.

134.    AARP's business acts and practices are unlawful because they violate the VPPA, as set forth above. AARP therefore is in violation of the "unlawful" prong of the UCL.

**Unfair**

135.    AARP committed unfair business practices, moreover, by disclosing California Plaintiffs' and Subclass members' Facebook Profile ID and viewing content to Meta without their clear, informed consent.

136.    AARP's conduct violates California's and the nation's legislatively declared public policy in favor of protection of consumer privacy. *See* S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."); California Bill Analysis, A.B. 375 Assem. (June 27, 2017) (noting that "[t]he unregulated and unauthorized disclosure of personal information and the resulting loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to the destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.").

137.    The disclosure of California Plaintiffs' and Subclass members' personal information without their express consent raises significant privacy concerns. The gravity of harm resulting from AARP's practice of sharing California Plaintiffs' and Subclass members' personal information—without first obtaining their clear and informed consent to that practice—outweighs any potential utility therefrom. AARP's conduct set forth in this Complaint violates established

public policy and is unscrupulous, offensive, and substantially injurious.

138.    AARP actually and proximately caused harm to California Plaintiffs and Subclass members in that, among other things, they suffered economic injury by overpaying for their subscriptions. California Plaintiffs and Subclass members paid AARP subscription fees and, in exchange, received access to members-only prerecorded video content. California Plaintiffs and Subclass members would not have subscribed to AARP, or would not have paid as much as they did for a subscription, had AARP fully and fairly disclosed its practice of sharing their video-watching behavior with third parties in the manner required by the VPPA.

139.    California Plaintiffs therefore seek restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A.    Certify this case as a class action, and appoint Plaintiffs as Class representative and the undersigned attorneys as Class Counsel;

B.    Enter judgment in favor of Plaintiffs and the Class;

C.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and Class members, including reformation of the challenged conduct and an accounting and purging of wrongfully obtained personal information;

D.    Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages or restitution to which Plaintiffs and Class members are entitled;

E.    Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

F.    Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

1          G.    Award such other and further relief as the Court deems necessary and
2  appropriate.

3                  **<u>DEMAND FOR JURY TRIAL</u>**

4        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all
5  issues triable as of right.

6

7  Dated: July 19, 2024               Respectfully submitted,

8                 By: <u>*/s/ Simon S. Grille*</u>
9                 Adam E. Polk (SBN 273000)
                Simon Grille (SBN 294914)
10                Reid Gaa (SBN 330141)
                Anthony Rogari (SBN 353784)
11                **GIRARD SHARP LLP**
                601 California Street, Suite 1400
12                San Francisco, CA 94108
                Telephone: (415) 981-4800
13                apolk@girardsharp.com
                sgrille@girardsharp.com
14                rgaa@girardsharp.com
                arogari@girardsharp.com
15

16                *Attorneys for Plaintiffs*

17

18

19

20

21

22

23

24

25

26

27

SECOND AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-05499-YGR